Case number 23-5880 of Vantax Wealth Management Inc versus RHP Hotels LLC et al. Oral argument is not to exceed 15 minutes per side. Mr. Rudner, you may proceed for the appellant. Good morning. I'm Steve Rudner here with John Josephsburg on behalf of Marriott Hotel Services. I've reserved five minutes and I appreciate the chance to be before the court. May it please the court. Perhaps the best indication of why the district court's opinion, which most notably failed to cite a single case as the basis for any of its determinations, must be reversed is how widely its holding deviates from well-established legal principles. The district court held that the clear terms of the force majeure clause, which neither party contended was ambiguous, should be disregarded. The district court held that the time for determining impossibility or illegality of performance was based on conditions existing at the time of the cancellation. In this case, three months before performance was to commence rather than the time of performance. With the exception of one case rendered by a court of original instance in New York whose jurisdiction is limited to cases under $50,000 and whose decisions are appealable to the trial court, no state or federal precedent has held that whether a force majeure clause is properly invoked is based on circumstances that exist at the time of termination. No federal or state precedent holds that a force majeure clause may be invoked based on a forecast or based on the uncertainty of future conditions or based on one party's unilateral forecast of future conditions. A standard which, of course, well... Excuse me for interrupting, counsel. You know, this is sort of an unusual confluence of circumstances, don't you think? Because this force majeure clause here comes up in the context of this COVID situation, which had never before been experienced. And so we were... You know, I guess the parties are sort of trying to apply the clause in an unusual context to some extent, don't you think? Well, I agree in part and disagree in part, Your Honor. Every time that there has been a significant force majeure case in the last 30 years, it has been something that is unanticipated. No one saw September 11th coming. And we have hotel-related force majeure cases that flow. The essence of a force majeure clause, of course, is that it arises from something that we can't anticipate. And we have had a number of cases dealing with this exact instance. We've had COVID cases with an identical or very similar force majeure clause that have been decided, and we've cited those in our brief, many of which or most of which I've been pleased that our firm has argued. Houston casualty involved the Marriott case, the Insight Global case out of the Business Court of Georgia, Lampo v. Marriott, the CLI case. Those are all COVID-related cases interpreting a force majeure clause under almost similar or identical circumstances, and all reach a holding completely contrary to the one that the district court reached. What's the best circuit court case? Do you have any at all? The best case, I think the most clear case, is the Insight Global case. And, of course, that's from the district court, the Business Court in the state of Georgia. But the Houston casualty case, which came out of the federal district court, is a good case as well, specifying that when a party cancels under a force majeure clause, it's excused only if performance would have been impossible at the time it was due. And, of course, that's the standard that the court should have used here and did not. So your position is that the hotel should have waited until right at the last minute and then say, can't do it? Not my position. The contract, the very clear language of the contract to which two sophisticated parties, for which two sophisticated parties negotiated and bargained, specified several things. The first is that something has had to have occurred, which on the day the contract is terminated, renders performance illegal or impossible when the time for performance comes. I don't think that's what the termination, the notice says. The notice says that the ability to terminate pursuit of this clause is conditioned upon delivering written notice to the other party setting forth the basis for such termination within 10 days after learning of such basis. So it doesn't say that you terminate it on the date that performance was supposed to occur. You have to give notice upon learning of the basis, which to me means a future event, not the performance itself. Yes, Your Honor, but those can be reconciled and have been in the cases which we cited. And if I may, I'll give you an example. So if something happens, if my performance is not due for three months from now, which is the time frame during which. If you have notice of the basis that you will not be able to perform, you have to give notice. Otherwise, you're stuck. You've got to give the 10 days notice. No, Your Honor. Respectfully, you have to. If on that day, three months in advance, you know that three months from now performance will be illegal or impossible, then that's when you have to give notice. But you can't speculate now that three months. All right. That's different. I thought you started out by saying you could only terminate on the day of the performance. No, Your Honor. Let me restate it. I have to read back what actually you said. You were saying the performance. Your Honor, if I misspoke, I apologize. Here's what I intended to say and what I believe I said. That the termination, on the date that you terminate, on that date, you have to know that it will be illegal or impossible to perform when performance is due. So you can terminate in advance. Under that very rare and limited circumstance. Okay. And that's what they said. I recognize that that's what they said, but of course they could not have known. Well, they said that they had notice because the Tennessee Health Department was eliminating the number of people that could go to these conferences. And that's the basis they're saying for termination. And they say we have to file the state health department. We don't have any choice. And therefore, we can't do the conference as we have contracted with you. Okay. You've raised several great questions in that question. I'm trying to paraphrase what their position is. I appreciate that. First, let me say that on the day that they canceled and on the day of performance, nothing in any of the health orders made it illegal or impossible for the hotel to provide the facilities. They couldn't perform as envisioned by the contract. Yes. They couldn't have the number of people that they contracted with you to have the opening reception for one thing, that the Tennessee Health Department would not allow them to do that. But you contracted with them to allow an opening reception for, I don't know how many people, 200 people or whatever it was. For 300. And Tennessee said, no, you can't do that. I guess you could say it's a minor breach. I'm not quite sure what you say. No. Well, first, let me say this, Your Honor, and I appreciate the question. The Metro Public Health Department order that they referred to first did not make it impossible or illegal to provide or use the facilities. What you're asking and the point that they raise is, as contracted. They did not do the reception as they envisioned it to do, as they contracted with you for the number of people they brought. Yes, Your Honor. So two points. First, you have to modify their contract and maybe say, well, it's a minor part of the contract. It's not a major part of it. Therefore, we're going to disregard what we contracted for opening reception. I appreciate that. First, of course, what you're supposing is consistent with the law. And by that, I mean that first, the clause doesn't say performance as contracted. That's not the standard in the force majeure clause. But even if it was, a party invoking a force majeure defense has to show that it used reasonable efforts to surmount the obstacles which it claims prevent performance. And in this instance, splitting the opening session into two parts, for example, would be a reasonable effort to surmount those obstacles. Well, I've been to so many conferences and opening – conference opening meeting to have everybody there is important rather than we're going to do it in segments. And to say that that's not essential, I don't know. I mean you have conferences to get everybody there. That's the whole point. Otherwise, you could have satellite conferences all over the country and say, well, that's going to satisfy – well, it's not what the idea is anyway. Well, to that point, Your Honor, and it's a great point, this contract specifies that nothing obligates the hotel to hold the events in the spaces that are originally designated. Spaces, that's a different thing. You can change the rooms, but you have to be able to fulfill the contractual obligations. Yes, but – Contractual obligation is to have an opening reception for so many people, and it's impossible to do it because the health department won't allow you to do it. Well, two points. First, on the day of the conference, it was not impossible to do. All restrictions were lifted. But you look at 10 days upon learning of the basis. I mean that's looking forward. To get back to your opening point, you're saying that you can only give notice as of the date of performance, but that makes a 10-day in advance provision without meaning. No, Your Honor, if I may continue, my time has expired. There are circumstances where certainly it could be the case that on X date you know that it will be impossible or illegal to perform on a date 10 days in the future. Such as this case? No, Your Honor, they did not know that. On every notice that the Metro Public Health Department issued, including the one upon which they based their termination, gave an optimistic – it had changed 98 times or something like that, 50 times or so. So it was constantly changing. And the last letter on which they relied, the one from Dr. Wright, gave an optimistic projection that things were headed in the right direction. It did not have any certainty or any mandate that specified that it could not change before performance. But to the one question that you asked that I didn't have the chance to respond to, you've correctly asked about what's the essence of this and don't we have to comply with the contract? Your question was, doesn't the event for 1,000 have to be for 1,000? There's another provision in this contract that has to be complied with as well. And that's the provision that specifies that the parties agree that they'll cooperate in complying with health regulations. And in this instance, where health regulations would require that the event be split into two rooms, that's a part of the contract term to which the parties also agreed. Thank you very much. That specific term wasn't in there about they agreed to split the conference into different rooms or segments if necessary. In fact, to the contrary, there were things in the contract as to what kind of event they were trying to organize. There is a provision in the contract that requires that the parties will cooperate in complying with health regulations. And where in this instance, those regulations would require you to put 1,000 people into two rooms rather than one, the parties were obligated to comply with that regulation and to cooperate in effectuating it. Which is exactly what the hotel had proposed to do. All right. We'll hear from your opposing counsel. Thank you. May it please the Court. Good morning, Your Honors. I'm Isaac Sanders, and I, along with Jay Harbison and Jeffrey Zager, represent the appellee of Vantax Wealth Management. Although Marriott offers a litany of arguments in an effort to try to convince this Court to reverse the trial court's grant of summary judgment in favor of a Vantax, each argument runs counter to both the factual evidence in the record and well-established Tennessee law. Before I dive into the specific arguments, I think it's important to reiterate that at bottom, this is a breach of contract case. It's a straightforward breach of contract case in which the trial court applied the undisputed facts in the record to well-established Tennessee law to arrive at the unavoidable conclusion that a Vantax properly invokes the force majeure provision in the parties' agreement and that no genuine issue of material fact exists in that regard. I'm going to try to address Marriott's arguments. I had a different plan, but I'm going to address them in the order in which they came up and specifically address some of the arguments that Judge Griffin raised or the issues that Judge Griffin raised. I'll start by pointing out that Marriott's position here would require the Court to read out of existence two important provisions in this contract, and the first is the 10-day notice provision. Counsel argued that a Vantax or any other customer is required to know that the event is illegally impossible in order to invoke, but that's not what the contract said. The contract says that a Vantax is required to provide notice within 10 days of learning of the basis that the event could not go forward. Absolute certainty can almost never be known in this context, and none of the case law that Marriott cites to says that. They say you can't make a force majeure decision based on a guess or based on pure speculation. We agree with that, but there was a lot more than that here. The other provision that gets read— What's your best case that they've cited? Their best cases are trial courts mostly. Do you have any particular case that you're depending upon? In combination, well, the cases that we're relying on primarily are Tennessee contract cases. It starts with the individual health care specialist's case that addresses the cardinal rule of contract interpretation, which is that you read the contract as a whole, and we submit that you cannot just read one sentence in the force majeure clause in isolation. You have to read it with the rest of the force majeure clause, and in addressing what this contract actually required, the court was required to look to the entire contract. We think that's the most important case here, and the Maggart case also addresses this as well. Those are both Tennessee Supreme Court cases. But actually, if you're going to address the arguments that Marriott makes here, we actually think that the three cases that support our position the most are the three cases that Marriott won that it is citing to in the record. And they're for two different points. One is this 10-day provision. Marriott uses this as a sword, and it's kind of a heads-I-win, tails-you-lose approach. Marriott invokes this provision if parties don't comply with it within 10 days, and that's the Lampeau case here from the Middle District of Tennessee, and they've done it in other cases. Sure. If you hadn't invoked the termination clause when you did, they would say your right to terminate a contract is barred because you did not comply with 10-day notice after you learned the basis of it. And they're going to say, well, the Tennessee Health Department told you on such-and-such date that you can't hold the conference as you wanted. You did not terminate within 10 days, and therefore there's no termination. Of course they would do that. And that's why it's kind of ironic here that they flipped it, and you're right, whether they're using it as a sword or a shield. You're exactly right, Judge Griffith, and it's more than ironic. I mean, it is the playbook. They did this in Lampeau here in Nashville in the Middle District of Tennessee, and then in their answer to the complaint, in their initial correspondence to my client, and in their early arguments, they took the exact same position. They actually filed an amended answer in this case specifically to preserve that argument because they believed at the time that there weren't any orders that actually covered the event dates. They were just wrong, and so the argument has pivoted and changed since this case started. There were, in fact, all kinds of circumstances that established that a van tax had more than a reasonable basis or reasonable certainty for knowing that the event couldn't go forward. But we can start with the orders themselves. The first thing that had to happen for the Metro Public Health Department to be able to enter its orders, which was they entered an emergency declaration back in March of 2020. Then, on March 11th, they actually extended that emergency declaration expressly past the event dates to June 30th, 2021. So you have the authority to issue these orders extended beyond the event dates. Well, that's the end date that Marriott, and this is, again, we like their cases where they've won because they took the exact opposite position. And I'm going to get to the two Georgia cases in a second. But just to close the loop on the proof of the circumstances known to a van tax in Marriott and to the city of Nashville, there was also a series of orders entered starting, I believe, in December 2020, and it continued past the dates that a van tax canceled. This is the 7th amended and restated Order 12G, which was entered on March 1st or became effective March 1st, and then Order 13 by the Metro Public Health Department, which was passed the day before a van tax canceled or terminated and was in effect the day after. Both of those orders were in effect until further notice. And so at that point, the parties had to decide, okay, what are we going to reasonably be able to do? Marriott had told a van tax in February, if these restrictions don't get lifted or get lessened, you can't do your event. Well, they advocated a wait-and-see approach. They said, well, we're going to get better information in early March, so wait and see. Well, when the Order 12G was entered, that's when the parties shift to start talking about a smaller event because they're at that point hoping that maybe 500 people will be able to gather because that Order 12G kept the restrictions for this event at 125 people. And then we get to the order that goes into effect the day after a van tax terminates. The limit is still 175. And in between this, we have a letter from the City of Nashville, from the Metro Public Health Department and Dr. Gil Wright, that's sent on March the 11th to Marriott and other hotel partners, hospitality industry partners, as they refer to them. This is a letter that Marriott and specifically this hotel requested from the city because they were having problems with customers canceling. We know from their list that dozens of customers canceled and that the hotel did not host a single event that resembled this event from the start of the pandemic until the restrictions were lifted over a month after a van tax terminated. And what that letter said was, we know we can project with reasonable confidence, which sounds a lot like reasonable certainty, which is the standard the district court applied, we can project that these are going to be the levels as of July the 1st, which is again after the event dates. The Public Health Department reminded everybody in that letter that high-risk events would still be capped, that that would include celebratory events. And I'll remind the court, if you look at the actual source materials, Marriott takes issue with this idea of equating this event to a wedding, but that's exactly what the Metro Public Health Department did in its restrictions. We don't say this was a wedding, but it's undisputed that the people who planned this event, current and former employees, referred to this as a family reunion. And in the Metro Public Health standard, they applied that very high-risk event standard to company parties, holiday parties, community events, and school events. This was not a CLE. This was not a general admission concert where nobody knew each other. The undisputed proof in the record is that these people knew each other, had been going back for years, and this was a celebratory event, this was a networking event, and the whole purpose of it was for a van tax, which provides financial services, to bring people from around the country to get together and generate business, and to market, and to network, and to throw parties. And so I want to talk about, well, first let me talk about the Georgia cases, and then I'll talk about this contract and what the parties actually agreed to. These two Georgia cases, Marriott won. The Houston Casualty Insurance Company and the Insight Global case, in both cases, Marriott took the position that the time to look at when you're deciding whether force majeure was improperly invoked is the time of termination, not the time of performance. That case from the Northern District of Georgia, the Houston Casualty case, Marriott won because the district courts said, well, performance would have been impossible at the time of performance, and force majeure might have applied, but it didn't look that way when you canceled. And so Marriott won that case. Virtually the same thing happened in the Insight Global case, and that's a weird decision. It's a very long decision. I actually think the court did a lot of work there, and there are lots of parts of the opinion that are reasonable. But the court says in this blanket fashion, well, you look at the time of performance in determining whether there's impossibility. But what the court actually looks at in the opinion, and this was actually noted by the district court in Georgia when it reviewed this opinion, the court actually looked at the circumstances that existed at the time of termination. And that case was distinguishable because the orders in Florida were actually set to expire by their own terms many, many months in advance of the event dates. And so when a party terminated back in, I think, August or September of one year, and the orders were set to expire within 90 days, it had improperly canceled by not waiting for an order or for circumstances that gave it reasonable certainty that the event couldn't go forward. And counsel who's sitting at this table over here argued in that case that what they were required to do was wait and see. And they were required to wait for circumstances that gave them reasonable certainty. That's exactly what Avantax did here. This reasonable efforts to surmount argument was raised for the first time in a reply brief, and so we don't think it's properly before the court. However, the proof in the record proves that that's precisely what Avantax did. And you can look at Marriott's own correspondence to the city of Nashville immediately after Avantax canceled to find that conclusion. After Avantax terminated, their events department sent a notice to the city saying, Avantax hung in there to the last second. They worked with us, tried to even come up with a smaller event, but we couldn't make it work because of your restrictions. And it was in that communication that Marriott was asking the city to do something because nobody can hold the events that we're trying to hold. The general manager of the hotel, who's since been elevated within Marriott, came in and testified that these restrictions made no sense. You'd be bringing 2,000 people, but you couldn't feed them. And so that brings me to this contract here. Marriott wants to act like the only thing that they were required to do was to... My time just left. I'm not sure how much I have left. I'm sorry. But Marriott acts like the only thing it was required to host that mattered here was a 1,200-person event, a reception. What Marriott leaves out in that argument is that this was a more than $1.5 million spend if you added in taxes and fees, and more than three-quarters of a million dollars of that was for food and beverage. This contract provided for a 1,200-person reception. They weren't going to spend three-quarters of a million dollars on that. This contract also provided for a meal room. The parties from both sides, the event planner for Marriott, the event planners for Avantax, all testified that they understood that this was to be a celebratory event. People knew one another. The purpose of this was networking and conferencing, and these people expected to eat together. Avantax also negotiated, and this is directly in the contract and confirmed by Marriott's own representative, concessions for open bars and for parties. There's a provision that talks about a party at the Wild Horse Saloon or at a bar downtown or at the Grand Ole Opry, and they're planning these things. Avantax was given options within the banquet menus under Marriott's contract. It's incorporated, and it was permitted to choose how to spend three-quarters of a million dollars over three days for food and beverage. Marriott comes in and tries to tell the court, all we had to do was host an event. That in and of itself is an admission, and it directly contradicts their position that this should be read in isolation, this force majeure provision sense. The use of the hotel facilities is the key issue here, Your Honors. Marriott tried to say, well, as long as the doors were open and we could host any type of large group, that was enough. Well, by the time you get to their reply brief on page 8, they're saying something a little different. They're saying, well, we agree we had to host an event. It just could be any event, and Avantax was required to work with us. Well, this was the other provision that they read out of existence, which is the reference to illegality in the force majeure provision. If the compliance with the law provision requires Avantax to comply with any and all changes in the law, then why have a reference to illegality in the force majeure provision? That provision contemplated circumstances such as a change in the laws or regulations that would render the event that was actually contemplated by the parties illegal or impossible. And so, in conclusion, and I'm nearing the end of my time and I want to give the court a chance to ask any questions that it may have, Avantax did exactly what Marriott required in its contract, exactly what Marriott has advocated in all of its other cases that Avantax should have done. It is undisputed, there is no dispute that every bit of information that was available to these parties said that the event could not go forward. Marriott's own conduct at the time, its admissions, its answer to the complaint all said, we agree that the event could not go forward as contracted. They're now asking the court, Marriott, to allow Marriott to unilaterally rewrite its contracts if these kind of circumstances come up in order to allow it to avoid putting on and hosting the event that it actually agreed to host and that a customer like Avantax agreed to pay for and to substitute it for something completely different. Marriott cannot be given unilaterally that power when it's such a material change in the contract. Unless your Honor has any questions or any of you have any questions, I'm sorry, I was looking at Judge Griffin again. I'll conclude. Thank you. Thank you very much. We will have rebuttal at this time. I'm just waiting on the clock. Ah, okay. Well, I appreciate the chance to engage in this rebuttal and I think there are several really critical points to make. The first point that I'd make is that I listened very carefully to opposing counsel and didn't hear him once contend that holding this meeting would have been illegal or impossible because it would not have been illegal or impossible. On the day that it was scheduled to occur, there were no restrictions. Prior to the day on which it was to occur, meetings were allowed. We've indicated in our briefs which of the meetings would have had to have been split. One function with alcohol, one welcome reception for 1,200 people would have had to be split in two rooms. They had business lunches occurring between morning and afternoon general sessions, but other than one president's dinner for 30 people, they had no evening functions. So this is not some massive food fest, despite the fact that they were paying a lot for what they were going to have, the one function with alcohol. But that's one function during the course of a long program that would have had to have been split, a significant split, and some food and beverage functions, some lunches that would have been split. I'd like to say this, besides the fact that it was not illegal or impossible to hold a meeting, and that's the force majeure clause to which the parties agreed. I just want to correct a few things in the record. Opposing counsel said that Marriott indicated to Avantax that you can't do your event. Marriott never said you can't do your event. The assumption, what opposing counsel really means, is that the event couldn't have been held as specifically contracted. Marriott has never contended that this event was illegal or impossible. It was legal and it was possible. Opposing counsel indicated that the limit for events at this time was 175 people, and that is also not correct. 175 people was the limit for small food and beverage functions at which people would be moving around. That does not apply to the general session. You could have had 1,000 people in that room for the general session. I'll say this. We have here three separate issues of law. First, we have to address whether it was legal or possible for the function to occur, and I think the answer to that question is it was legal and it was possible, both on the day that performance was to occur and on the day that they gave notice. On the day they gave notice, it was possible to hold the event. It was possible to provide the facilities and to use the hotel. There would have had to have been minor modifications to the program. Those were contemplated in the contract, which specifies that the hotel had the right to change function rooms. The parties agreed to comply with local health regulations. We have to read those provisions and give them meaning. But besides the fact that it was legal and possible to hold the program and to provide the facilities and to use the hotel, we next have to look at the determination of when that should be made, that decision should be made. I want to call to your attention the fact that this particular clause, this exact clause, and these exact questions of law have been addressed. The Insight Global case made clear that the measuring date is the time of performance. Uncertainty alone does not justify an assumption that regulations in place today will remain in place months from now. And the Insight Global case made clear that the provide or use standard that's embraced in this force majeure clause allowed the hotel to change spaces, precisely as we've argued here today. In the Houston casualty case, the outcome is exactly the same, construing the exact same clause. When a party cancels under a force majeure clause, it is excused only if its performance would have been excused, would have been impossible at the time it was due. It has to be the case that on the day you cancel, on that day you have to know that it will be illegal or impossible on the date of performance. Those facts do not exist here. The district court has rewritten this contract. The district court has changed illegal or impossible to use or provide the hotel facilities to illegal or impossible to use or provide the hotel facilities as contracted. That's not the clause to which the parties agreed. The district court has changed the notice provision, which is a critically important provision. And so instead of having to give notice within 10 days, and with respect, I reject the concept that there's a trap contained in that clause. It may seem like it's a trap, and I'll tell you why it seems like it's a trap. A Vantax is trying to wrestle with, well, when should we have given notice? If we'd done it here, it would have been too early. If we'd done it here, it would have been too late. The reason that it feels that it's a trap is because there never was a date on which it was illegal or impossible to use the hotel facilities. That's why they can't find the triggering event. If there had been such a date, they would have had to have given notice within 10 days of the date. But because it never became illegal and never became impossible to provide or use the hotel facilities, we can't find the date on which they should have given notice of that fact. That's the reason. It's not a trap. It's that the clause to which the parties agreed does not apply to the facts that are before us. We ask something very simple, and that is that this court give meaning to the expressed terms of the contract in every regard. And for that reason, we ask that it be remanded and that summary judgment be granted in favor of the hotel. Thank you very much. Thank you, and the case is submitted. Thank you. Thank you both for your arguments. There being no further cases or arguments this morning, the court may be adjourned. The court is now adjourned.